**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paradigm Hospital Group, LLC, an Arizona limited liability company; Paradigm Hospital Arizona Founders Group, LLC, a Delaware limited liability company; Paradigm Foothills Hospital, LP, a Delaware limited partnership; and Kenneth L. Pettit, D.O.,<br><br>Plaintiffs,<br><br>vs.<br><br>Crossroads Program Management, LLC, a foreign limited liability company; Pinnacle III, LLC, a foreign limited liability company; Timothy Long; Chuck Denk; and Richard L. Dehart,<br><br>Defendants. | No. CV-10-1010-PHX-GMS<br><br>**PRELIMINARY INJUNCTION ORDER** |

Pending before the Court is Plaintiffs' Motion for Temporary Restraining Order (Doc. 2) and Amended Verified Complaint and Application for Temporary Restraining Order and Temporary and Permanent Injunctions (Doc. 28). For the reasons listed below the Court will grant Plaintiffs' Application for a preliminary injunction against Defendants Timothy Long, Chuck Denk and Crossroads Program Management, LLC (the "Crossroads Defendants"). No injunction shall issue at this time against Defendants Pinnacle III, LLC or Richard L. Dehart.

Federal Rule of Civil Procedure 65 authorizes the Court to issue a Preliminary Injunction upon a proper showing. To prevail on a request for a preliminary injunction Plaintiff must show either "(a) probable success on the merits combined with the

[likelihood][1] of irreparable injury or (b) that [it] has raised serious questions going to the merits, and that the balance of hardships dip sharply in [its] favor." *Bernhardt v. L.A. County*, 339 F.3d 920, 925 (9th Cir. 2003). The Ninth Circuit has explained that "these two alternatives represent extremes of a single continuum, rather than two separate tests. Thus, the greater the relative hardship to the moving party, the less probability of success must be shown." *Immigrant Assistant Project of L.A. County Federation of Labor (AFL) v. INS,* 306 F.3d 842, 873 (9th Cir. 2002) (citation omitted).

In the present case, the Court held a two-day hearing on July 13 and 14, 2010. The evidence presented at the hearing established that the Plaintiffs are likely to establish the following facts at trial.

**FACTUAL BACKGROUND**

By 2004, Plaintiff Dr. Kenneth L. Pettit, D.O. became interested in establishing an acute care hospital in the Ahwatukee community of Phoenix. Toward that end, in 2004 he commissioned a report from IntelliMed at a cost of $600 that collected patient data relating to the feasibility of such a hospital. (Ex. 35). In 2006, Pettit got in touch with a healthcare consulting firm, Aardex, and provided Aardex with a copy of his IntelliMed report. He sought Aardex's assistance in evaluating the suitability of an acute care hospital for Ahwatukee. Pettit then began working with Defendant Timothy Long, who was an employee of Aardex. In the course of the communications between Pettit and Aardex, Defendant Long, among other things, prepared a Market Feasibility Study dated December 21, 2006 (Ex. 3), that Aardex provided to Pettit without charge.

Several months later, in May 2007, Long and an associate at Aardex, Defendant Chuck Denk, left Aardex and formed their own company, Defendant Crossroads Program Management, LLC. Pettit continued his discussions with Defendants Long, Denk and

---

[1]In *Winter v. Natural Resources Defense Counsel, Inc.*, 129 S. Ct. 365, 375 (2008) the Supreme Court held that "the Ninth Circuit's possibility standard is too lenient." The Court stated that the "standard requires plaintiff seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction. *Id.* (citations omitted).

Crossroads on a speculative basis to determine whether or not Pettit and his Paradigm entities would enter into a consulting relationship with Crossroads concerning the investigation and/or creation of an acute care hospital facility in Ahwatukee.

On March 14, 2008, Crossroads and Plaintiffs entered into a Professional Consulting Services Agreement (Ex. 154). The Agreement specified certain tasks and required compensation for those tasks. It required, for example, that Crossroads prepare for Plaintiffs a Market Feasibility Study for which it would be paid $17,500, a Real Estate Development Package for which it would be paid $22,500, a Hospital Business Plan for which it would be paid $37,500, and an Investment Package to attract proposed investors for which Crossroads would be paid $15,000. The Agreement further provided that "Crossroads agrees to disclose to the Owner all information discovered or derived in the performance of the Basic Services required herein. Crossroads will not disclose to any third party such information . . . without the prior written permission of the Owner." *Id.* at § 8.0.

Throughout the ensuing relationship, Crossroads dealt with committed investors in the Paradigm Founder's Group, and they met with over half of the approximately 37 potential investors identified by members of that group. Although most of the perspective investors were supplied by the Plaintiffs, Crossroads did provide Dr. Curtis Page as a potential investor to the Plaintiffs. Crossroads also solicited confidentiality agreements from, and provided business plans to, various other potential investors and/or hospital operators with whom Crossroads had connections or initial contacts. Among these were Defendants Pinnacle and its CEO, Richard Dehart.

Prior to receiving the June 2008 business plan from Crossroads, Pinnacle executed a Three-Party Confidentiality Agreement (Ex. 155) among itself, Crossroads and Paradigm so that Pinnacle could assess the investment opportunity with Paradigm. Among other things that agreement provided that each party would use the confidential information received by it from another party "solely for use in evaluating the potential business transactions" and would not use such information "to compete in any way with the disclosing party," to use in its "own research or development effort" or otherwise "disclose, divulge, communicate

and/or identify any Confidential Information received by it to third parties."

Although Pinnacle was initially interested in being an operator/investor, it rejected the opportunity to invest in an Ahwatukee hospital as of late September 2008.

Crossroads had discussions on Paradigm's behalf with other potential hospital operators and investors. During the course of this undertaking, Crossroads apparently recognized that its members were agents of Paradigm sufficient to create certain fiduciary duties. "There is a fiduciary responsibility for the chairman [Pettit] and the contract agents [Crossroads' Chuck Denk and Tim Long] to present due diligence findings to the Founder's Physician Investor Group." (Ex. 108 at 11064.)

Long and Denk also helped to draft operating agreements and private placement memoranda and initiated talks with third-party payers and insurance companies. Because Crossroads, Long and Denk learned that potential investors preferred starting with a smaller hospital than they felt the market could bear, Crossroads planned various configurations of hospitals with varying growth potentials.

Initially, in late 2006 and early 2007 Plaintiffs and Aardex, Crossroads' predecessor, looked at a few potential locations for the hospital. (Exs. 112-14). First among the studies prepared by Crossroads for Plaintiff was the November 29, 2007 Chandler site proposal (Ex. 156). It discussed the feasibility of a 110 or a 76 bed facility somewhere in west Chandler. On March 13, 2008, Defendants prepared and provided to Paradigm a market feasibility study for a 96 bed hospital facility situated in Ahwatukee. (Ex. 20). The follow-up April 3, 2008 study (Ex. 74) retained the same parameters.

Nevertheless, approximately two months later in June 2008, the location for the proposed hospital was identified as an approximately 35 acre parcel at Chandler Boulevard and 50th Street that had previously been projected as a Walmart location. While Crossroads was still its agent, Paradigm spent approximately $25,000 on conducting traffic surveys, soil assessments, environmental phase 1 studies, an ALTA survey, and meetings with City of Phoenix to ascertain the viability of the site for a hospital. As of June 20, 2008, the evolving Business Plan (Ex. 22 at Bates No. PET05A44) provided for a 110-bed hospital located at

50th Street and Chandler Blvd. That site remained the projected hospital site for all of the subsequent business plans prepared by Crossroads for Paradigm – the September 8, 2008 110-bed hospital plan (Ex. 2), the April, 2009 120-bed hospital plan (Ex. 47), and the May, 2009 56-bed hospital plan (Ex. 26).

It also remained the site for the feasibility studies and business plans subsequently prepared by Crossroads for its own Medical Investment Group, LLC ("MIG") including the October 13, 2009 feasibility study for a 44-bed hospital expandable up to a 120-bed hospital (Ex. 52), and the April 2010 business plan for a 72-bed hospital (Ex. 53).

After Crossroads had finished its initial round of the basic services required by the consulting agreement, it was paid $92,500 by Paradigm. Paradigm then paid monthly retainers of $15,000 to Crossroads from September 2008 to February 2009. In February 2009 the wisdom from the Plaintiffs' perspective of paying Crossroads an ongoing monthly retainer, and potential conflicts between Crossroads and potential investors, coupled with Crossroads' desire to switch from being a promoter and a consultant to a developer of the Ahwatukee hospital, resulted in a change of Crossroads' potential role in the project. Paradigm ceased to pay the $15,000 monthly retainer to Crossroads. As of February 2009, Paradigm had paid to Crossroads $187,547.00 for their consulting services. (Ex. 119). Plaintiffs subsequently entered a separate consulting agreement with Rockwall, which took Crossroads' place as the project consultant.

At about this same time, the Crossroads principals, Denk and Long, began meeting with Jim McDowell in an effort to put together a limited liability company, Medical Investment Group, LLC, that would then make a proposal to the Paradigm Founders Board to be the developer of the Ahwatukee hospital. In late April Crossroads provided the April 2009 Business Plan (Ex. 47) to Paradigm and then, in early May 2009 formed a partnership named Medical Investment Group, LLC ("MIG") with Jim McDowell.

Crossroads has a 50% interest in MIG and McDowell's Company, McDowell Enterprises, LLC, had the other 50% interest, with McDowell having the controlling interest in case of disagreements. According to the testimony of Defendant Long, in the negotiation

- 5 -

and creation of MIG, none of the Defendants provided McDowell with any information concerning the development of a hospital in Ahwatukee except the "high level" proprietary information that they had. They provided none of the specific studies that Crossroads had done for Paradigm. At the direction of McDowell, Crossroads prepared a May 2009 business plan for Paradigm for a 56-bed hospital on the 50th Street and Chandler Boulevard property, but the business plan was never provided to Plaintiffs.

At the May 21, 2009 meeting of the Paradigm Founder's Group, MIG presented a proposal to be named the developer of the hospital. As a result of the presentation by MIG, Paradigm appointed MIG, and specifically its 50% owner McDowell Enterprises, LLC, as its agent for purposes of obtaining the 50th Street and Chandler property. (Ex. 128). Crossroads subsequently represented to members of the Paradigm Founder's Group that they were working on obtaining the land for the Plaintiffs. (Ex. 131).

Shortly thereafter MIG became concerned that it might not arrive at a development agreement with the Plaintiffs. As a result, without informing Plaintiffs, it began developing a separate plan by which MIG could develop an Ahwatukee hospital independently of Plaintiffs. That plan involved the recruitment of Dr. Curtis Page to head up the local physicians group, and other hospital operators and investors to be the alternative to Pettit, Paradigm and Rockwall. Crossroads began discussions with Dr. Page around September 2009.

On October 13, 2009, Crossroads drafted a Market Feasibility Study for MIG (Ex. 52). Crossroads never obtained the permission of any of the Plaintiffs to provide MIG with any information "discovered or derived" during its work for Plaintiffs. MIG further began to enter into confidentiality agreements with Pinnacle III and possibly others such as Randy Unter, Jim McShane and Integrated Medical Campus to consider pursuing a relationship with Pinnacle as an investor and/or operator in the development proposal with Dr. Page. (*see* Exs. 88, 118). Long and/or other Defendants began to see Plaintiffs as "competition" in the development of the hospital and to openly express their preference for working with Dr. Page and Pinnacle III (see Exs. 49, 92).

In February 2010, Jim McDowell presented Pettit with a letter he had drafted, (and misdated), terminating the agency relationship between McDowell Enterprises and Paradigm for the procurement of the property at 50th Street and Chandler Boulevard. McDowell indicated he needed to be released from the agency relationship so that he could pursue other methods of procuring the property. Pettit signed the letter on February 18, 2010. (Ex. 202).

In early March, 2010 MIG made a development proposal to Paradigm and Rockwall that was not acceptable. In an e-mail dated March 5, sent to the potential operators of the MIG hospital under the Page alternative, Defendant Long indicated together with icons indicating approval that the "home team" was "in" and Pettit and Rockwall were "out." He then indicated that Pettit and Rockwall were out because they "couldn't answer the bell."

MIG had Crossroads prepare a Business Plan for MIG dated April 10, 2010 (Ex. 53) which provides for the construction of a 44-bed hospital that is expandable to 120 beds on the 50th Street and Chandler site. Crossroads did not obtain the permission of any of the Plaintiffs to disclose any information to MIG or anyone else that Crossroads had obtained while working for Plaintiffs.

Shortly thereafter, on April 26, 2010, MIG and Dr. Page noticed a meeting at which they sought to obtain investors in their Ahwatukee hospital to be built on the 50th and Chandler site. Pettit heard about the meeting and attended. He noted that Page and representative(s) of Crossroads were running the meeting. The Defendants proposed to build MIG's hospital using the same service providers that they had solicited and obtained for use in planning, building and operating Paradigm's hospital. When asked to sign a confidentiality agreement prior to hearing the presentation, Pettit declined and left the meeting.

At the hearing on this matter, Defendant Long acknowledged that they are now in competition with Pettit and Paradigm.

No evidence was introduced at the hearing that Pinnacle or Dehart had breached the Confidentiality Agreement, used material from the Business Plan or otherwise disclosed it in any way. Nor was evidence introduced at the hearing that Dehart or Pinnacle have a

1 present ownership interest in an entity that is using the confidential business information of
2 Plaintiffs provided by the Crossroads Defendants or otherwise.

## Legal Analysis

**A. Likelihood of Success**

In Plaintiffs' Amended Verified Complaint and Application for Temporary and Permanent Injunctions, (Doc. 28), they assert causes of action for: (1) Breach of Contract; (2) Misappropriation of Confidential and Trade Secret Information; (3) Breach of Fiduciary Duty; (4) Tortious Interference with Paradigm's Business Relations; (5) Defamation-Slander; and (6) Conspiracy. After the hearing, the Court concludes that Plaintiffs are likely to prevail against Crossroads, Long and/or Denk on at least their first two counts against them.

**1. Breach of Contract**

**a. Professional Consulting Services Agreement**

In the Professional Consulting Services Agreement between Crossroads and Plaintiffs, "Crossroads agrees to disclose to the Owner [Paradigm] all information discovered or derived in the performance of the Basic Services required herein. Crossroads will not disclose to any third party such information . . . without the prior written permission of the Owner." (Ex. 154 at 6). The Basic Services required in the consulting agreement include: (1) a Feasibility Study containing certain elements --site analysis, development plan, market assessment, and hospital financials; (2) a Development Package including real estate budgets and pro formas, a site plan, and scope of work and outline specifications; (3) a Hospital Business Plan including market assessments, a local medical marketplace and competitor analysis, patient volume projections, physicians, hospital development planning, financial projections, risk assessments and project team and operations, key result areas and deal points and conclusions and recommendations; and (4) an investment package including a preliminary investment summary, a draft project agreement, a development package, a site analysis and a hospital business plan.

Pursuant to the plain terms of the Consulting Services Agreement then, Crossroads agreed that it would not disclose to anyone "any information discovered or derived in the

- 8 -

performance of" these basic services "without the prior written permission" of the Plaintiffs. Such an agreement, by its own terms, is very broad with respect to the information obtained by Crossroads or its agents in performance of the Consulting Services Agreement for Plaintiffs.

It is equally clear to the Court that Crossroads, and/or its principles, Long and Denk, disclosed information pertaining to the formation, development and operation of an acute care hospital in Ahwatukee generally, and, more specifically, to the development and operation of a hospital at Chandler Boulevard and 50th Street to at least the following people and on the following occasions: (1) to McDowell in their negotiations with him prior to and after the formation of MIG in May 2009; (2) continuing information to MIG after its formation including, but not limited to, information contained in the Marketing and Feasibility Study drafted by Crossroads for MIG dated October 13, 2009 and information contained in the MIG Business Plan dated April 2010; (3) information to Dr Page and his associates in "recruiting" him/them to be an alternative to Plaintiffs in the construction of an Ahwatukee hospital; (4) information to Pinnacle, Dehart, Unter, McShane and Integrated Medical Campus provided beginning in Autumn of 2009 pertaining to the operation of a hospital in Ahwatukee; (5) information to the physician investors who attended the April 10, 2010 meeting called by Dr. Curtis Page and MIG for purposes of informing potential physicians and/or investors of their formation of a competing enterprise to form and operate a hospital in Ahwatukee.

Crossroads, Long and Denk assert that none of the instances of shared information identified above amounts to a breach of contract for the following reasons: (1) Crossroads' agreement with Plaintiff was a confidentiality agreement not a covenant not to compete; (2) all of the information shared by Crossroads was publicly obtainable; (3) the information shared by Crossroads was, at least with respect to McDowell, only high-level proprietary information; it did not include any of the specific studies performed by Crossroads for Plaintiffs; (4) the services provided by Crossroads under the contract were only conclusions at particular times as to the feasibility of a particular configuration of factors that varied by

ownership type, hospital size, and hospital location. Thus, they argue, none of the information they shared with others was "information discovered or derived" in the performance of their services for Plaintiffs. The Court finds none of these arguments persuasive.

Defendants are correct that the Consulting Services Agreement does not contain an agreement not to compete. It does, however, contain a confidentiality agreement. With respect to a confidentiality and non-disclosure agreement like the one at issue here, Defendants remain "free to work for whomever they wish, wherever they wish, and at whatever they wish, subject only to the prohibition against misusing plaintiff's propriety information." *Harvey Barnett, Inc. v. Shidler,* 338 F.3d 1125, 1134 (10th Cir. 2003) (quoting *MAI Basic Four, Inc. V. Basis, Inc.,* 880 F.2d 286, 288 (10th Cir. 1989). Thus, the pertinent confidentiality provision preserves "'the valuable confidential information'" discovered or disclosed by the Crossroads Defendants while performing their investigative, consulting and representative services for the Plaintiffs. *Id.* In other words, the fact that Defendants retain the right to compete against Plaintiffs does not mean that they have the right to disclose to others information they "discovered or derived" while working for Paradigm, or using that information while themselves competing with Plaintiffs in MIG.

Much of the information compiled by The Crossroads Defendants for Plaintiffs is publicly ascertainable. There is no exception in the contract, however, permitting the disclosure to others of information "discovered or derived" by Defendants that is otherwise publicly ascertainable. The contract protects from Defendants' dissemination of even publicly available information if it was discovered, derived or compiled by Crossroads while working for Plaintiffs. *Cf. Rivendell Forest Prods. v. Ga-Pac. Corp.,* 28 F.3d 1042, 1046 (10th Cir. 1994) (applying Colorado law and holding that "a trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful and valuable integration of the public domain elements . . . [that] gave the

claimant a competitive advantage.").[2]

Even more to the point, however, is the testimony of the Crossroads Defendants themselves who acknowledged that the Plaintiffs were paying not merely for data but for the Crossroads Defendants' expertise in interpreting the data and arriving at conclusions from it. Defendants' interpretation pertained to the feasability and successful business operation of an acute care hospital in Ahwatukee, and, more specifically, that operation with respect to certain locations within Ahwatukee. Such interpretation also involved determinations concerning the service specialty "blend" that an Ahwatukee hospital would need to be successful given the nature of the Ahwatukee community, the competition for the acute care hospital market within Ahwatukee, the size of the hospital most appealing to necessary investors, working with various investors, possible alternative layouts of the hospital campus in light of available investment mixes, an assessment of third-party payor relationships, responsible hospital operators, developers, etc.

The Crossroads Defendants have made no claim that their opinions and conclusions formed in interpreting the available data for Plaintiffs during their ongoing analysis of the viability of different Ahwatukee hospital configurations was not "developed and derived" while they were in the employ of Plaintiffs. To the extent that they have attempted to raise such an argument, it is wholly unpersuasive.

The Crossroads Defendants have suggested, however, that because their present concept for a hospital is different in ownership configuration, size and time from any of the models that they analyzed for Plaintiffs, the information that they would have communicated to others in connection with it, would not have been information that they developed or derived while working for Plaintiffs. This argument appears to the Court to carry little to no weight at this point in the proceedings.

According to Defendants own testimony, they began to disclose "high-level" proprietary information concerning the planned hospital to Jim McDowell when they began

---

[2] The contract at issue here specified that Colorado law would apply.

- 11 -

negotiating the formation of MIG with him. During these negotiations, Crossroads was preparing two business plans for Plaintiffs on the 50th Street and Chandler Boulevard site. The one they provided to Plaintiffs in April 2009 (Ex. 47) was a Business Plan for a 120-bed hospital on the 50th Street and Chandler Boulevard site. The May Business Plan they prepared for Plaintiffs was for a 56-bed hospital on that same site.

They thus prepared for Plaintiffs an analysis of different hospital configurations on the same site. They further had already provided analyses and formed opinions for Plaintiffs related to the requirements, practical considerations and strategy of building a hospital in Ahwatukee generally. A finder of fact is not likely to credit the Crossroads Defendants' claim that they did not rely on this previous information in making future adjustments to the ownership structure and hospital size in planning their own Ahwatukee hospital that they proposed to develop on the very same site in competition with Plaintiffs.

### b. Three Party Confidentiality Agreement

All of the parties signed a three-way confidentiality agreement (Ex. 155) prior to delivering to Pinnacle a copy of the June 2008 Business Plan. This confidentiality agreement, by its terms, applied to the work conducted and materials prepared by The Crossroads Defendants for Plaintiffs. The parties to the agreement specified, among other things, that they would not use the disclosed information "to compete in any way with the disclosing party," or "as a basis for any future research or development effort by the recipients, its employees, agents or their respective affiliates." The parties further agreed to "not disclose, divulge, communicate and/or identify any Confidential information received by it to third parties." (Ex. 155).

For the reasons set forth above, the Court believes, based on the evidence and testimony provided at the hearing, that Plaintiffs are likely to prevail as to The Crossroads Defendants with respect to an argument that they have breached the Three Party Confidentiality Agreement. The parties did not provide sufficient evidence at hearing for the Court to conclude that Plaintiffs will likely establish that either Pinnacle or Dehart has breached the Three Party Confidentiality Agreement.

## 2. Misappropriation of Trade Secrets

Under the Colorado Uniform Trade Secrets Act, the term "trade secret" means "the whole or any portion or phase of . . . confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value." Colo. Rev. Stat.§ 7-74-102(4). The statute further specifies that, to be a "trade secret," the purported owner of the trade secret "must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes." *Id.*

In cases in which the act is violated, injunctive relief may be an appropriate remedy. "Temporary and final injunctions including affirmative acts may be granted on such equitable terms as the court deems reasonable to prevent or restrain actual or threatened misappropriation of a trade secret." Colo. Rev. Stat. § 7-74-103. *See also* Colo. Rev. Stat. § 7-74-106 ("In an action under this article, a court shall preserve the secrecy of an alleged trade secret by reasonable means, which may include granting protective orders in connection with discovery proceedings, holding in-camera hearings, sealing the records of the action, and ordering any person involved in the litigation not to disclose an alleged trade secret without prior court approval.").

The Crossroads Defendants again assert that the material that they discovered or discerned concerning the operation of an Ahwatukee hospital while under contract with Plaintiffs cannot be considered trade secret information because it was all in the public domain. Even if this were true, it would not prevent the compilation of information prepared by Crossroads from being protected under the Trade Secrets Act. "[A] trade secret can exist in a combination of characteristics and components each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Rivendell,* 28 F.3d at 1045; *see also Harvey Barnett,* 338 F.3d at 1129 (holding that the existence of a trade secret is a matter of fact and that compilations of otherwise public information can nonetheless constitute a trade secret).

Even so, as has been demonstrated above, it was not just the compilation of data, but was Defendant's expert analysis, opinions and conclusions regarding the data that it compiled that provided the value of Defendants' services to Plaintiffs. There has been no creditable suggestion that The Crossroads Defendants' analysis, opinions and conclusions were readily available to the public.

Pursuant to Colorado law, in determining whether information constitutes a trade secret, a fact finder should consider:

> (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Colo. Supply Co. v. Stewart,* 797 P.2d 1303, 1306 (Colo. Ct. App. 1990).

It does not appear to the Court that there were many, if any, employees of Plaintiffs' entities, nor is it apparent that the compilations, opinions and conclusions of The Crossroads Defendants were known outside of the group to which Plaintiffs granted access. Further it appears for the most part that Plaintiffs granted access to that information only to persons who entered a confidentiality agreement with Plaintiffs. This practice was promoted principally by the Crossroads Defendants. The Crossroads Defendants point to the fact that Plaintiffs' banker, Mr. Toth was permitted to attend meetings and see some reports without signing a confidentiality agreement. Nevertheless, there is ample testimony that Plaintiffs, and Crossroads as their agents, took considerable steps to preserve the confidential nature of Crossroads' work for Plaintiffs, and that the information was adequately protected. The reports themselves identify and emphasize their confidential nature. Further, it was most often Defendants themselves, as agents for Plaintiffs, that took care to protect the information contained in their reports from unprotected dissemination and that copies of any of Crossroads' reports or other confidential information did not go to potential investors or others without that party entering into a confidentiality agreement.

Plaintiffs paid to acquire the information. They paid approximately $190,000.00 directly to the Crossroads Defendants for their services. In addition to the amount paid directly to the Crossroads Defendants, they were privy to the results of soil surveys, ALTA surveys, traffic studies, phase one environmental assessments and development sessions with City of Phoenix employees pertaining to the 50th Street and Chandler Boulevard property that Plaintiffs paid other vendors approximately $25,000 to obtain.

The acquisition of the information took some time. The Crossroads Defendants began work on the assessments provided to Plaintiffs prior to entering the consulting agreement with them. Crossroads provided its first study for Pettit in December 2007. It provided its last Business Plan to Plaintiffs in April 2009, but prepared another for them in May 2009. After the Crossroads Defendants were discontinued as project consultants, Plaintiffs appointed an entity, in which Crossroads had a 50% interest, that had been formed with McDowell as Plaintiffs' agent for purposes of acquiring the property at 50th Street and Chandler Boulevard. The appointment was made in approximately May of 2009. The agency appointment remained in place until February 2010.

The Crossroads Defendants were either under the obligations of a consulting contract to Plaintiffs, or were Plaintiffs' agent for purposes of acquiring the property for a period of approximately two years. In either capacity it appears the Crossroads Defendants acquired proprietary information about operating and developing a hospital in Ahwatukee, and they further acquired necessary information concerning the feasibility of developing a hospital campus on the parcel of land located at 50th Street and Chandler Boulevard. The information was essential to developing a hospital in the Ahwatukee area, and particularly essential to developing a hospital at 50th Street and Chandler Boulevard. Having the information would provide a considerable competitive advantage to Plaintiffs over any competitors. It would take a competing developer approximately $200,000 and fifteen months time to replicate the confidential information belonging to Plaintiffs that was obtained by the Crossroads Defendants.

The Court thus concludes that Plaintiffs would likely prevail on their trade secret

claim against the Crossroads Defendants at the trial of this matter.

**B.  Irreparable Harm**

Plaintiffs have established a likelihood of irreparable harm. "To obtain equitable relief for misappropriation of trade secrets a Plaintiff must show that it owned a valuable trade secret which it communicated to another under circumstances making it inequitable for the recipient to use or disclose it." *Henry Hope X-ray Products, Inc. v. Marron Carrel, Inc.,* 674 F.2d 1336, 1340 (9th Cir. 1982).

The evidence introduced at the hearing demonstrated that when engaged in competition to establish a community hospital in a distinct community, such as Ahwatukee, there is considerable competitive advantage to being the first hospital in a position to begin construction or operations. The evidence further established that the studies and work commissioned by Plaintiffs from the Crossroads Defendants provided Plaintiffs with that competitive advantage. The Crossroads Defendants have subverted or risk subverting that competitive advantage by appropriating for themselves Plaintiffs' confidential information that the Crossroads Defendants were paid to develop, analyze, provide and keep confidential for the benefit of Plaintiffs. *Omnitech Int'l v. Clorox Co.,* 11 F.3d 1316, 1325 (5th Cir. 1994) (holding that "[t]he purpose of the trade secrets statute is to prevent someone from profiting from another's trade secret, thus acquiring a free competitive advantage."); *see also Stuhlbarg Int'l Sales Co. v. John D. Bush & Co., Inc.,* 240 F.3d 832, 841 (9th Cir. 2001) (noting that "threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm").

Although the Crossroads Defendants argue that monetary damages would be an adequate remedy in this case, they provided no evidence at the hearing that convincingly suggests it would be. They acknowledge that there would be a significant advantage to the first competing hospital to be ready to begin operations in Ahwatukee. They do not convincingly suggest that their compilation of data and their evolving conclusions concerning the development of a hospital in Ahwatukee are inapplicable to the hospital they now propose to build in direct competition with, and on the same site as, the hospital project they

were developing in conjunction with Plaintiffs. At the hearing they did not provide evidence sufficient for the Court to believe that if Plaintiffs lose out on that significant advantage, that the Crossroads Defendants have the wherewithal to realistically reimburse them economically for the results of that loss.

It is the Crossroads Defendants that have cast themselves in the role of directly competing with Plaintiffs, at least in part, by using or threatening to use Plaintiffs' own confidential business information in the development of their competing hospital. And, while the Crossroads Defendants have the right to compete with Plaintiffs, they do not have the right to use confidential information they generated for Plaintiffs in doing so. While with sufficient time and independent resources Defendants could, in large part, replicate that information, it is Plaintiffs' expenditure of the time and resources necessary to generate the confidential business information that currently gives rise to their legitimate competitive advantage. It is the loss of this competitive advantage that is the irreparable harm if an injunction does not issue. Injunctive relief is appropriate in such cases to prevent irreparable damage–in this case the loss of competitive advantage. The Court therefore finds that sufficient irreparable damage exists to justify the issuance of an injunction.

**C.     Public Policy Considerations**

The entry of a limited injunction by the Court does not prevent Plaintiffs or their competitors from building a hospital in Ahwatukee. It merely prevents the Crossroads Defendants from sharing any confidential business information discovered or derived from their work for Plaintiffs.

**D.     Bond**

Little testimony was provided concerning a bond amount at hearing. The Court determines that given the interests at stake and the apparent equities an appropriate bond amount is $25,000.

For the above reasons,

**IT IS HEREBY ORDERED** granting the request for Preliminary Injunction (Doc. 28).

**IT IS FURTHER ORDERED** denying the Motion for Temporary Restraining Order (Doc. 2) as moot.

**IT IS FURTHER ORDERED** that Defendants Crossroads, Long and Denk, and those persons in active concert or participation with them who receive actual notice of this Order, **BE AND ARE HEREBY**, commanded to cease, desist and refrain from, either directly or indirectly through others, engaging in the following activities:

1. Disclosing or using, directly or indirectly, through any means whatsoever, Paradigm's Confidential Information. Such "confidential information" means information "discovered or derived" by the Crossroads Defendants during the performance of their Basic Services under Crossroads' consulting agreement with Plaintiffs. This injunction explicitly does not prevent the Crossroads Defendants from competing with the Plaintiffs in the matter of developing an Ahwatukee hospital so long as the competition does not result from information "discovered or derived" during the Crossroads Defendants' work for Plaintiff, but, instead, results from information, interpretation, strategies and conclusions obtained from wholly independent sources.

2. Soliciting, diverting or taking away the business of existing or prospective investors either identified in the Physician List contained in any of the business plans or feasibility studies prepared by Crossroads for the Plaintiffs or learned by Defendants while they were involved with Paradigm's Hospital Project.

**IT IS FURTHER ORDERED** that Defendants be, and are hereby, required to return all Confidential Information and other documents and things belonging to Paradigm or containing Paradigm's Confidential Information, including all originals and all copies or replications of any such documents or items, in every form, **within five calendar days** from the date this Preliminary Injunction is signed.

This Order shall not be effective unless and until Paradigm executes and files with the Clerk of the Court security, in the form of a bond or otherwise, in conformity with law, in the amount of Twenty-Five Thousand Dollars ($25,000).

///

This Order shall remain in effect until a final determination has been made on the merits of this matter.

DATED this 27th day of July, 2010.

*H. Murray Snow*
G. Murray Snow
United States District Judge